**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ROBERT E. DOWDA, JR.,** | ) | |
| **individually and on behalf of all** | ) | |
| **similarly situated individuals;** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No.:  2:06-CV-00255-WHA** |
| | ) | |
| **H&R BLOCK, INC., H&R BLOCK** | ) | |
| **TAX SERVICES, INC. and** | ) | |
| **H&R BLOCK FINANCIAL** | ) | |
| **ADVISORS, INC.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

COMES NOW the Plaintiff, ROBERT E. DOWDA, JR., individually and on behalf of a class

of all persons throughout the United States who are similarly situated, and files this Complaint

against the Defendant, H&R BLOCK, INC., H&R BLOCK TAX SERVICES, INC. and H&R

BLOCK FINANCIAL ADVISORS, INC. (collectively "H&R Block" or "Defendants").  Plaintiff,

by and through his attorneys, alleges, upon personal knowledge and his own acts, upon information

and belief as to all other matters and based upon the investigation made by and through his attorneys

and the investigation of the New York State Attorney General's Office, the following:

**NATURE OF THE CASE**

1.    This is a class action against H&R Block on behalf of all persons or entities who

opened Express Individual Retirement Accounts ("Express IRA") contemporaneously with the

purchase of tax preparation services at H&R Block's offices throughout the United States.  These

Express IRAs were uniformly marketed and sold to H&R Block's customers without regard for the

1

customer's tax, investment and income requirements and without adequate disclosures regarding the fees and commissions charged and received by H&R Block and its tax preparers.

2.    H&R Block marketed the Express IRAs based upon a standardized script that was utilized by its tax preparers across the country.  The majority of these tax preparers have little or no financial planning training, education or experience.  Despite knowing that its tax preparers were not properly trained, H&R Block aggressively marketed and sold hundreds of thousands of Express IRAs through its local offices.

3.    Given the excessive maintenance fees assessed to customers who opened Express IRAs, H&R Block knew or should have known that the vast majority of these accounts would likely decrease in value and ultimately cause the Express IRA to be completely depleted.

4.    As a result, H&R Block customers who opened Express IRAs with low opening values, typically around $300, and who failed to successively deposit additional amounts, found themselves owning accounts worth less than the opening value of the account.  Defendants' failure to disclose to customers that this result was not only likely, but probable, constitutes a breach of fiduciary duty by H&R Block to its customers.

5.    Defendants' actions also constitute a deceptive trade practice, a breach of the implied covenant and good faith and fair dealing, a breach of contract and a misrepresentation and suppression of material facts.  As a result of this improper and immoral conduct, Defendants have been unjustly enriched.  Plaintiff seeks compensation for members of the class who opened an Express IRA and also seeks injunctive relief.

## PRELIMINARY STATEMENT

6.    H&R Block is the nation's largest tax preparation company, with approximately

2

10,000 offices throughout the United States. In a typical year, H&R Block helps file more than 15 million tax returns -- most for middle- and low-income clients -- representing more than 15% of the tax returns filed in the United States.

7.     In recent years, H&R Block has made a concerted effort to expand its business to offer financial products to its customers.  In doing so, H&R Block holds itself out to its clientele as a trusted financial adviser, describing itself as a "trusted tax partner" and "personal financial partner." Its current ad campaign assures customers that H&R Block is "In Your Corner."

8.     An investigation conducted by the State of New York's Attorney General has revealed, however, that H&R Block abuses its relationship of trust by steering its customers into an unsuitable, fraudulently marketed, poorly performing, fee-ridden "retirement vehicle" called the Express IRA: a retirement account that more often than not will shrink over time because its only investment option is a money market account with an interest rate that does not cover fees --fees that H&R Block fails to adequately disclose.  Without understanding these fees, H&R Block's customers cannot do the cost benefit analysis showing that, for most, the Express IRA is a losing proposition. H&R Block has abused its access to customers who trust it to do their taxes-- for many the most important financial transaction of the year -- and has violated statutory and common law by knowingly misleading its Express IRA customers.[1]

9.     In the last four years H&R Block has opened more than 500,000 Express IRA

---

[1]This is not the first time that H&R Block has faced scrutiny over its financial products. In 2003, H&R Block settled an investigation by the New York Attorney General and other state attorneys general regarding the way it automatically charged customers for its "Peace of Mind" warranty product without obtaining the customer's affirmative consent.  (H&R Block Assurance of Discontinuance, April 2003).  Furthermore, H&R Block recently announced a class action settlement concerning its Refund Anticipation Loan financial program.

accounts.  H&R Block sees products such as the Express IRA as a way of retaining customer refunds and ensuring that customers return each year to H&R Block.  As the Chief Executive Officer of H&R Block explained: "The more important attribute of the express IRA that we think we can leverage overtime [sic] is the retention impact it has on tax clients.....clients who leave some of their money behind with us at H&R BLOCK, are far more likely to come back to H&R BLOCK year after year...."

   10.    Unlike many other IRAs, which offer various investment options such as stocks, bonds, and mutual funds, the Express IRA has only one investment option, an FDIC insured money market account that typically pays an interest rate less than the rate of inflation. It is common knowledge that money market accounts are a poor vehicle for retirement savings.

   The Wall Street Journal recently noted: "Money-market funds are a smart way to set aside money for next month's tuition or for emergencies. But with an interest rate that hovers around the inflation rate, they are an awful vehicle for retirement savings. `Especially with savings rates a slow as they are, a 100% allocation to a money-market account is not safe,' says Richard Thaler, a University of Chicago economist . . . he calls it a `guarantee of inadequate retirement income.' (Wall Street Journal, August 4, 2005 at A2).

   11.    In 2002, after its own studies revealed that the Express IRA's interest rate was too low relative to its fees, H&R Block began falsely promoting the Express IRA as a "better way to save" with "great rates," despite knowing it earns a negative rate of return. For the last several years, the median Express IRA account, with a balance of $323, has earned about $3.00 in interest per year, nowhere near enough to cover the $10 annual maintenance fee for the product, much less inflation and other Express IRA fees such as: (1) a $15 set-up fee, (2) a $15 re-contribution fee, (3) a $25

account termination fee (which at one point was $75), and (4) duplicative "tax complexity" fees, averaging $20 per client, charged by H&R Block to file requisite-IRA-related tax forms. In addition, a 10% federal tax penalty is incurred when a Traditional IRA is closed without meeting certain requirements.

12.    H&R Block's fees exceed the interest it pays for 85% of its Express IRA customers. Even taking into account as a "gain" the tax benefits of opening an IRA, analysis of the accounts opened in 2002 -- the year when the Express IRA was first available nationwide and for which the most data is available -- shows that as of now about 79% of H&R Block customers who opened accounts in 2002 have lost money.[2]   Of these 2002 accounts, 43% have been closed or have experienced withdrawals leaving a balance of under $10 -- evidence that H&R Block customers are taking their money out as the value of their accounts shrink each year.

13.    The situation is worst for H&R Block's poorest customers, whom H&R Block claims it is helping.  These customers often make the minimum contribution of $300 to open an Express IRA and then make no further contributions.  Again looking at the approximately 117,000 accounts opened in 2002, some 43% (over 51,000) had total contributions of $300 or less. More than 99% of the individuals who opened $300 accounts in2002 have lost money.

14.    H&R Block's senior management has been aware of the problem with the Express IRA from the beginning.  Shortly after the 2002 tax season, H&R Block's Chief Executive Officer, Mark Ernst, was informed of the fundamental deficiency of the Express IRA through an e-mail by an H&R Block district manager:

---

[2]New York Attorney General, Elliott Spitzer, reached this calculation by comparing the benefits of opening each Express IRA account (such as interest earned and net present value of tax benefits), against the costs (such as fees and tax penalties for early withdrawals).

I've been thinking about all the clients that we signed up for IRA's [sic] this past tax season. Our mission was to help these clients begin a savings plan since many of them had none. Many used $300 from their refunds to fund the plan. My concern is the $10 maintenance fee that they will be assessed. . . . Many of these clients do not have savings or checking accounts. Even those clients with checking don't always want others having access to them due to problems with possible bounced checks. So they will earn about $1.50 in interest and be charged $10 maintenance fee. This may result in a lot of clients electing to withdraw their money from the IRA. Then they will be assessed $75 (25% of their initial investment).

I really don't think the maintenance fees should exceed the amount of interest that we are paying on these accounts. Clients won't be happy seeing their [sic] investments decreasing and not increasing. (HRB 90228-90229).

The CEO forwarded the e-mail to the H&R Block product manager adding his own concerns:

The attached note (from a DM) reflects the general sense that I think exi[s]ts – that Express IRA is the right thing for our clients, but the product is designed to nickel and dime clients to the point where our field people don't [sic] feel as good about the product as they should. You should seriously look at whether, with a bank product design, we can eliminate the fees so that our people feel better about the offer. (HRB 90228).

There was apparently no action taken with respect to the CEO's concerns. Indeed, in nearly four years H&R Block has done nothing to fix the fundamental deficiency of the Express IRA – the interest paid still does not cover H&R Block's fees, especially for accounts owned by poorer customers who can only afford to deposit the minimum amount.

15.    Hundreds of thousands of the low and middle income customers targeted by H&R Block lost money by investing in an Express IRA. For example, a 32-year-old Albany, New York resident with a taxable income of $17,847 made a one-time, minimum contribution of $300 to an Express IRA in 2002. Over the past four years, the investment earned $10.29 in interest but incurred a total of $45 in fees. The Albany resident's investment lost 12% of its value and will continue to decline.

16.     Not only does the Express IRA lose money for H&R Block's customers, it is marketed to them in a grossly misleading way.  H&R Block fails to disclose the full extent of the fees associated with the Express IRA; fails to adequately warn its customers that these fees will reduce their principal over time unless they make large or repeated deposits; fails to adequately warn customers that an Express IRA is inappropriate for short-term savings needs; and fails to provide its low-income consumers with adequate guidance in determining whether the Express IRA is a suitable investment. H&R Block's wholly inadequate disclosures violate New York law and are particularly egregious in light of its fiduciary duties as a "financial partner."

## PARTIES

17.     Plaintiff is a resident citizen of Jefferson County, Alabama.

18.     Defendant H&R Block, Inc. is incorporated under the laws of the State of Missouri, with its principal place of business at 4400 Main Street, Kansas City, Missouri 64111.  H&R Block, Inc. conducts extensive business in this judicial district and is subject to personal jurisdiction in this judicial district.

19.     Defendant H&R Block Tax Services, Inc. is incorporated under the laws of the State of Missouri with its principal place of business at 4400 Main Street, Kansas City, Missouri 64111. H&R Block Tax Services, Inc. conducts extensive business in this judicial district and is subject to personal jurisdiction in this judicial district.

20.     Defendant H&R Block Financial Advisors is a subsidiary of H&R Block and is incorporated under the laws of the State of Michigan, with its principal place of business at 4400 Main Street, Kansas City, Missouri 64111.  H&R Block Financial Advisors conducts extensive business in this judicial district and is subject to personal jurisdiction in this judicial district.  H&R

Block offers the Express IRA through H&R Block Financial Advisors in conjunction with a New York company called Reserve Funds, Inc. ("Reserve Funds"). H&R Block Financial Advisors distributes and markets the Express IRA, while Reserve Funds invests the Express IRA funds in a bank money market account. In its contract with Reserve Funds, H&R Block Financial Advisors has agreed to "act in a fiduciary capacity with respect to [Express IRA] Client-investors." (HRB 4811).

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a nationwide class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. This class is more specifically defined as follows:

> all individuals or entities who purchased an Express IRA or similar product from H&R Block Tax Services, Inc., H&R Block Financial Advisors and/or other related entities on or after March 17, 2000; but excluding (1) any putative class member who is currently in bankruptcy; (2) any putative class member whose obligations to Defendant have been modified or discharged in bankruptcy; (3) any governmental agency or entity and (4) any person or entity who, in accordance with any court approved notice, properly executes and submits a timely request for exclusion from the class.

22.     The Class is so numerous as to make joinder impracticable. The exact number of Class members is unknown, but can be determined from records maintained by H&R Block. It is believed that the Class contains tens of thousands of members. In many or most instances, Class members are unaware that they have claims. Whether or not they are aware, however, their claims have damages in amounts that, while significant, when taken individually may be too small to justify the expense of a separate lawsuit; aggregated, however, they make litigation financially feasible.

23.     The Representative Plaintiff's claims are typical of the claims he seeks to represent

for the Class. Representative Plaintiff will fairly and adequately represent the members of the Class who are victims of the same scheme or practice, and he has no interests that are antagonistic to the claims of the Class. Thus, the Representative Plaintiff's interests in this action are antagonistic only to the interests of H&R Block, and the Representative Plaintiff will vigorously pursue the claims that he asserts on behalf of the Class.

24.    The Representative Plaintiff has retained counsel who are competent and experienced in class action litigation, and who have represented other consumers and insureds in complex class action litigation.

25.    Common questions of law and fact affect the rights of each member of the Class and common relief by way of damages, injunctive relief, declaratory judgment and other equitable relief are sought for the Class.

26.    Numerous and substantial questions of law and fact common to all members of the Class will control in this litigation and will predominate over any so-called individual issues. Among the numerous predominant common questions of law and fact with respect to the members of the Class are the following:

(a)    Did H&R Block engage in uniform deceptive acts and practices, whether by omission or commission, as more particularly alleged in this Complaint?

(b)    Did H&R Block, as specified throughout this Complaint, charge exorbitant fees and pay low rates of return on its Express IRA products?

(c)    Did H&R Block breach its contracts with Plaintiff and the Class as set forth in this Complaint?

(d)    Did H&R Block conceal from or fail to disclose to Plaintiff and the Class the

material breaches and misconduct set forth in this Complaint?

(e)     Did H&R Block's breaches or misconduct described in this Complaint constitute a

breach of fiduciary duty owed to or a constructive fraud upon Plaintiff and the Class?

(f)     Was H&R Block unjustly enriched as a result of its Express IRA scheme?

(g)     Did H&R Block devise and deploy a scheme or artifice to defraud, or engage in a

common course of charging exorbitant fees?

27.     A class action provides a fair, efficient and superior method, if not the only method,

for adjudicating this controversy.   The substantive claims for the deceptive practice the

Representative Plaintiff seeks to present for the Class are substantially the same and will require

evidentiary proof of the same kind and application of the same (or only a limited number of

categories of) law.

28.     The Representative Plaintiff will seek to identify all members of the Class through

such discovery procedures as may be appropriate and will provide the Class with such notice of this

action as the Court may direct.

## JURISDICTION AND VENUE

29.     Jurisdiction of this Court is proper under 28 U.S.C. §§ 1332, because the matter in

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and is a class

action in which more than two thirds of the members of the class of Plaintiffs are citizens of states

different from H&R Block and none of the bases to decline jurisdiction pursuant to 28 U.S.C.

§ 1332(d)(B)(4) are present.

30.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b), (c) and

(d).  Defendants maintain offices, has agents, transacts business or is found within this judicial

10

district.  Defendant inhabits and/or may be found in this judicial district, and the interstate trade and commerce described herein is and has been carried out in part within this judicial district.

## FACTS

### I.    Background

### A.    Introduction of the Express IRA

31.    H&R Block earns most of its revenues by preparing individual tax returns for a fee. In addition to tax services, H&R Block offers non-tax products to its tax clients such as loans, mortgages, and warranties.

32.    In recent years, H&R Block has made an effort to offer financial products to its tax preparation customers in order to increase its revenues and create the perception that it is more than a tax preparation company.  One such product is the Express IRA, an individual retirement account ("IRA") that can take the form of either a Traditional IRA or a Roth IRA.[3]  Because H&R Block tax professionals are not licensed to sell securities such as stocks, bonds, or mutual funds, the Express IRA has only one investment option, an FDIC insured money market account that typically pays an

---

[3]A Traditional IRA allows the investor to take an immediate tax deduction for the amount invested in the Traditional IRA.  Any return on the investment in a Traditional IRA accrues tax free but all withdrawals from a Traditional IRA are taxed as income.  If the investment is withdrawn before the investor turns 59 the investor not only pays income taxes on the full withdrawal but also pays an additional 10% penalty (with a few limited exceptions).

Unlike a Traditional IRA, a Roth IRA does not allow for an immediate tax deduction of the amount invested.  However, any return on an investment in a Roth IRA not only accrues tax free but can be withdrawn tax free after a certain amount of time.  The principal amount of a Roth IRA may be withdrawn at any time, but taxes and a 10% penalty are assessed upon the withdrawal of any return on the principal if (with a few exceptions) the withdrawal occurs before the investor turns 591/2.

interest rate less than the rate of inflation.  In January 2001, H&R Block piloted the Express IRA in about 10% of its offices nationwide.

33.     H&R Block began offering the Express IRA nationwide in 2002.  Shortly before the roll-out, the CEO of H&R Block described the Express IRA and the company's rationale for marketing it in an investor conference call:

> I can tell you precisely what our strategy and our thinking is around the express ira. Last year, we did about 24,000 or 25,000 of those accounts, on a pilot basis in certain regions of the country. We're rolling that product out nationally . . . we think that as the account sizes build over a number of years it'll be a nice - - it'll never be dramatically large - - but a nice, little profit center. The more important attribute of the express IRA that we think we can leverage overtime [sic] is the retention impact it has on tax clients. . . . What we believe to be the case is that clients who leave some of their money behind with us at H&R BLOCK, are far more likely to come back to H&R BLOCK year after year and therefore we could overtime [sic] improve the retention rate we have on the core client base.

(Transcript of Q2 2002 H&R Block Earnings Conference Call dated Nov. 28, 2001 at 10).

34.     H&R Block trains its tax professionals to offer the Express IRA towards the end of the tax preparation session.  The median initial deposit to an Express IRA account is approximately $300; the median account balance is $323.51.

35.     The typical customer who opens an Express IRA earns under $30,000 per year and is saving for the first time.  (HRB 6381).  Approximately 80% of clients who open an Express IRA fund it through their tax refund.  (HRB 6359).

**B.     Poor Performance of the Express IRA**

36.     The Express IRA has failed as a vehicle to help people save for their long-term goals. As noted above, 85% of all Express IRA customers have earned interest in an amount less than the set-up and recurring fees H&R Block collected.  Given the interest rates H&R Block has paid for

much of the product's life, accounts with balances of less than $1000, which are the vast majority, have almost always declined in value over time. Even taking into account as a "gain" tax benefit of opening an IRA, the vast majority of those who opened accounts in 2002 have lost money. These trends have continued in later years:

- Of the customers who opened accounts in 2003, 37% have lost money to date. 38% of the 2003 accounts have closed or have a balance under $10. Of the 2003 accounts, 36% had total contributions of $300 or less. More than 58% of customers with these $300 accounts have lost money and nearly half (47%) have closed their accounts or have reduced their balance to less than $10.[4]

- Of the customers who opened accounts in 2004, 34% have lost money to date. 31% of the 2004 accounts have closed or have a balance under $10. Of the 2004 accounts, about 41% had total contributions of $300 or less. More than 43% of customers with these $300 accounts have lost money and 38% have closed their accounts or have reduced their balance to less than $10.

- Of the customers who opened accounts in 2005, 36% have lost money to date. 19% of the 2005 accounts have closed or have a balance under $10. Of the 2005 accounts, about 54% had total contributions of $300 or less. More than 44% of customers with these $300 accounts have lost money and 18% have closed their accounts or have reduced their balance to less than $10.

37.     H&R Block has attempted to justify the Express IRA by arguing that the product teaches persons with lower incomes an important lesson about saving. But this lesson is lost when Express IRA customers see the value of their accounts decline every year. In addition, H&R Block points to the Saver's Credit, a tax credit the government gives to low-income individuals who make

---

[4]H&R Block did not produce fee data to Attorney General Spitzer's office for about half of the accounts opened in 2003. The accounts with missing fee data were not considered in determining the percentage of the 2003 accounts that have lost money to date. The majority of the missing 2003 accounts are #300 accounts, which are more likely to lose money. Thus, these calculations likely understate the percentage of 2003 accounts that have lost money to date.

contributions to an IRA, as a potential benefit of the Express IRA.[5]  However, over half of Express

IRA customers are not eligible for the Saver's Credit.  Moreover, H&R Block takes advantage of the

customers who receive a Saver's Credit by taking a substantial percentage of the credit through fees.

Any remaining amount erodes over time because of the Express IRA's low interest rate.  In enacting

the federal Saver's Credit, Congress could not have intended to encourage savings through a vehicle

where the adviser takes more in fees than the client earns in interest.

     38.     The following examples are representative of the performance of Express IRA

accounts:

> A 40-year-old resident of Jamestown, New York, with a taxable income of $4,084
> made a one-time contribution of $300 to a Traditional Express IRA in 2002.  Given
> the Jamestown resident's low income, it is unclear whether the resident received a tax
> deduction.  Even if the resident did, the deduction was immediately lost because the
> resident closed the account just seven months later, likely incurring a 10% early
> withdrawal tax penalty of $30.  The account earned just 47 cents in interest but was
> charged a $15 opening fee, an IRA form fee of $9.21, and a closing fee of $75.
> Because of fees and penalties totaling $129, the Jamestown resident's investment
> declined in value by 43% in just seven months.

> A 41-year-old resident of Amsterdam, New York, with a taxable income of $8,932
> made a one-time contribution of $300 to a Traditional Express IRA in 2003.  While
> the Amsterdam resident may have received an up front tax deduction, that deduction
> was immediately lost because the resident closed the account three months later,
> likely incurring a 10% early withdrawal tax penalty of $30.  The account earned just
> $.91 cents in interest but was charged a $15 opening fee, IRA form fee of $9.18, and
> a $25 closing fee. Because of fees and penalties totaling $79, the Amsterdam
> resident's investment declined in value by 26% in just three months.

---

[5]To receive a 50% matching credit, a married couple filing jointly must make between $0-
$30,000; a head of household must make between $0-$22,500; and all other filers must make
between $0-$15,000.  To receive a 20% matching credit, a married couple filing jointly must
make between $30,001-#32,500; a head of household must make between $22,501-$24,375; and
all other filers must make between $15,001-$16,250.  To receive a 10% matching credit, a
married couple filing jointly must make between $32,501-$350,000; a head of household must
make between $24,376-$37,500; and all other filers must make between $16,251-$25,000.
(HRB 5979)

A 68-year-old resident of Brooklyn, New York, with a taxable income of $25,421 made a one-time contribution of $300 to a Roth Express IRA in 2004. The account earned just $5.18 in interest but was charged a $15 opening fee, $10 in maintenance fees, and a $25 closing fee when the account was closed after 18 months. Because of fees totaling $50, the Brooklyn resident's investment declined by 15% in just a year and a half.

A 40-year-old resident of Verona Beach, New York, with a taxable income of $17,828 made a one-time contribution of $300 to a Traditional Express IRA in 2005. The Verona Beach resident may have received a Saver's Credit of $150 and an upfront tax deduction. However, the deduction was lost because the resident closed the account just 10 months later, likely incurring a 10% early withdrawal tax penalty of $30. The account earned just $4.41 in interest but was charged a $15 opening fee, an IRA form fee of $12.99, a Saver's Credit form fee of $15.18, and was charged a closing fee of $25. More than 62% of the value of the Verona Beach resident's Saver's Credit went to paying fees and penalties totaling $93.76.

## II.     H&R Block deceives its Express IRA customers.

39.     Because of the Express IRA's inherent deficiencies, H&R Block can only induce customers to open an account through a marketing strategy that consistently misrepresents the benefits and hides the deficiencies of the Express IRA.  There have been numerous red flags alerting H&R Block that its statements about the Express IRA are misleading, but until the Attorney General's investigation, H&R Block made no effort to correct its disclosures.  As a result, the Express IRA has been sold to hundreds of thousands of customers who have seen their hard-earned savings eroded by H&R Block's fees.

### A.     H&R Block misrepresents that the Express IRA is a "better way to save" and pays "great rates," despite knowing that the Express IRA earns a negative rate of return.

40.     In 2002, the Express IRA was a product in crisis. Numerous studies showed that the interest rate was too low in relation to the product's fees:

●     An August 2002 research proposal observed:  "Currently the product is offered at a $15 initial fee with less than a 1% rate of return. <u>Recognizing that this</u>

15

is not competitive with other IRAs in the market, [H&R Block is] interested in testing various fee and return options to induce more purchases across the Tax Client base." (HRB 89995) (emphasis added).

●       An August 2002 draft report by the Express IRA product manager noted that research on the Express IRA had found: "Interest rate too low" and "Fees too high." (HRB 89543; 89617). The report suggested eliminating the set up and maintenance fees but this proposal was not implemented. (HRB 89545; 89619).

Moreover, in May 2002, after being informed of the Express IRA's negative rate of return by a tax professional, H&R Block's CEO remarked about the sentiment at the company: "the product is designed to nickel and dime the clients to the point where our field people don't [sic] feel as good about the product as they should." (HRB 90228).

41.    Rather than alert its customers and tax professionals to this problem, H&R Block sought to hide it by indoctrinating them with the false impression that the Express IRA earns a positive rate of return. The firm began stating in its introductory brochure that an Express IRA is a "better way to save," and a way to "save for your future while you earn great rates on the money you deposit." (HRB 5977-78). The brochure further claims the customer can "[s]tart making more money on your savings right now." (HRB 5978). This "better way to save" and "great rates" message is featured prominently on the front of the brochure. (HRB 5977).[6] The brochure is the only general explanatory material for the Express IRA given to the customer before an Express IRA is opened. The brochure does not mention or list the Express IRA's fees.

---

[6]The idea that the Express IRA is an investment with a significant rate of return is emphasized by a chart in the brochure showing a hypothetical investment growing from $0 to $52,516 over a 15 year period (assuming monthly contributions of $250 per month for fifteen years and an annual interest rate of 2.0 percent). (HRB 5981). H&R Block should know that the assumption behind the chart - - is extremely unrealistic for a product generally sold to people making less than $30,000 per year, whose median balance is only about $323 annually for two or more years.

**1.    The Express IRA is not a "better way to save" for many H&R Block customers because it earns a negative real rate of return.**

42.    The message that the Express IRA is a "better way to save," and a way to "[s]tart making more money on your savings right now," conveys at the very least that a customer can expect to earn a positive rate of return on his investment.  Indeed in a "Welcome" brochure mailed to the customer, H&R Block claims: "[w]hen you save money in your Express IRA, you earn interest on your contributions, and then you earn interest on the interest!  The effect of compounding interest is how you build up your savings." (HRB 4416).  H&R Block has been well aware for years that this is not the case.

43.    As is typical for a money market account, the interest rate on the Express IRA is lower than the inflation rate.  In 2002, the first year the Express IRA was offered nationwide, the average Express IRA rate was 0.50% (the inflation rate was 2.4%).  In 2003, the average Express IRA rate was 1.00% (the inflation rate was 1.9%).  In 2004, the average Express IRA rate was 0.80% (the inflation rate was 3.3%).  (HRB 57659).  In 2005, the average Express IRA rate was about 1.5% (the inflation rate was 3.4%).

44.    The typical Express IRA customer earns a negative return on his investment. For the median account, which has a balance of approximately $323, a 1.00% rate would yield approximately $3.23 a year, not enough to cover the $10 annual maintenance fee H&R Block charges for the Express IRA, much less cover inflation and other fees.

45.    Indeed, almost a year after it began conveying the impression that the Express IRA earns a positive rate of return, a November 2003 report by the product manager of the Express IRA acknowledged that this was not the case, reporting:

Top 4 reasons tax pros are not offering the [Express IRA]:

1.    $15 setup fee - "it's too steep for my clients"

2.    $15 recontribution fee - "they've already paid once, why charge the again?"

3.    Low interest rate - "my client will never make up the fee"

4.    $10 annual maint. fee - "my clients have to pay this in addition to the $15 fee"

The report concluded: "From the Tax Pro's perspective, clients are charged more in fees than they will earn in interest . . . [a]s a result many don't offer the product to their clients, and in particular, won't offer it to their low-income clients." (HRB 66753).

## 2.    The Express IRA's rates have been far from "great."

46.    H&R Block knew that its claim that the Express IRA pays "great rates" was false. As H&R Block is well aware, money market rates in general are extremely low relative to other investments. Indeed, as early as 2002, the manager of the Express IRA product acknowledged that the Express IRA does not pay "great rates," writing in an e-mail: "We realize that a money market interest rate does not offer above average yields." (HRB 80894).

47.    As noted above, many H&R Block tax professionals felt the Express IRA interest rate was extremely low. A July 2002 H&R Block study reported that "[s]ome Tax Pros unaidedly expressed dissatisfaction with the 2002 [Express IRA] product claiming the interest rates were a sizeable conversion hurdle." (HRB 4928).

48.    Rather than addressing the fundamental problems highlighted by its tax professionals, H&R Block management attempted to appease the tax professionals by subsidizing the rate for a period of 18 months starting in early 2003. (HRB 42432). The subsidy had the effect of adding 0.80% to the prevailing Express IRA rate of 0.10% (one tenth of one percent). But even with the

subsidy, as evidenced by a November 2003 H&R Block report, taxprofessionals expressed dissatisfaction with an interest rate that was less than 1%.  (HRB 66753).

49.    H&R Block Management decided to end the rate subsidy in the spring of 2004. It decided to end the subsidy because: (1) tax professionals and clients had been "desensitized" to the "extremely low interest rate environment"  (HRB 42432; 42468); (2) future interest rate increases would allow them to phase out the subsidy without reducing the interest rate paid to clients; and (3) there was a desire to maximize profits on the Express IRA.  (HRB42468-9).

50.    By October 2004, the Express IRA rate ranked dead last in H&R Block's own internal comparison with other money market rates.  (HRB 16202).  In internal discussions during February 2005, H&R Block was candid that it did not even aspire to offer "great rates": the Express IRA product manager stated that H&R Block would be "comfortable to be in the bottom half nationally in terms of interest rate."  (HRB 13083).

51.    Despite the abandonment of its attempt to make the Express IRA rate competitive with other money market rates, H&R Block still continued to push the "great rates" message in 2004 and 2005. It did so despite qualms about the accuracy of the message.  In August 2004, when reviewing the Express IRA promotional material, an employee at H&R Block headquarters observed — "I'd like to modify the message on this brochure as well e.g. the `great rates' message doesn't seem to sit well with tax pros." (HRB 14241) (emphasis in original).  Ultimately, H&R Block decided to keep the "great rates" message.  The product manager of the Express IRA testified during the investigation leading to the filing of this complaint that he "had the same concerns" but the decision to keep the message "was a compromise that we made."

52.    In 2006, well after Attorney General Spitzer's investigation began, H&R Block stopped using the "great rates" message in its marketing materials.

**B.    H&R Block's disclosures concerning the Express IRA are inadequate.**

53.    H&R Block has a statutory and common law duty to adequately and fairly disclose material facts about the Express IRA to its customers. Moreover, it has the heightened duties of a fiduciary because it holds itself out as a trusted adviser to its Express IRA customers. Indeed, H&R Block represents: "[w]e're here to provide you the most complete tax and financial advice." (HRB 4412). And H&R Block's contract with Reserve Funds, the provider of the Express IRA's underlying money market account, recognizes that H&R Block will "act in a fiduciary capacity with respect to [Express IRA] Client-investors." (HRB 4811). It has failed to do so with respect to the Express IRA.

**1.    H&R Block fails to adequately disclose the fees associated with the Express IRA.**

54.    H&R Block misleads customers by hiding the full cost of the Express IRA. Currently, the basic Express IRA fees include: (1) a $15 fee to open an Express IRA; (2) a $10 annual maintenance fee; (3) a $15 fee to recontribute to the Express IRA; and (4) a $25 account termination fee (reduced from $75).  (HRB 1201, 2530).

55.    While the fees associated with the Express IRA are substantial relative to its low rate of return, H&R Block fails to instruct its tax professionals to discuss the product's fees with the customer. Indeed, the written policies and procedures instructing tax professionals on how to offer the Express IRA do not mention fees and only instruct the tax professional to"[p]rovide the client with **Disclosure and Custodial Agreement** and gain acceptance." (HRB2563) (emphasis in original).  But this Disclosure and Custodial Agreement is a 19-page document filled with small

print, most of which is legal jargon incomprehensible to the customer. In any event, the agreement only lists the Express IRA's $25 closing fee. (HRB2593).[7]

56.     The Express IRA's fees are listed on a card describing the Express IRA product given to tax professionals (HRB 2530), but H&R Block has no policies or procedures requiring its tax professionals to show this product card to customers or to discuss the listed fees.

57.     After a customer has decided to purchase an Express IRA and the tax professional inputs the necessary information into a computer program, the only fee listed on the tax professional's computer screen is the $15 opening fee. (HRB 93963). H&R Block has no policies or procedures instructing the tax professional to direct the customer's attention to this fee.

58.     At the end of the tax preparation session, when the customer has already decided to purchase the Express IRA and is ready to sign the tax return, H&R Block provides various documents to the customer. Starting in 2004, these documents included a fee summary listing the $15 opening fee, but not the other fees associated with the Express IRA. (HRB93894). In addition, some customers also receive a receipt listing the $15 opening fee after the tax return is signed. (HRB 93886).[8]

59.     H&R Block does not give customers a written document describing all of the Express IRA's fees in a comprehensible format before the customer decides to open an Express IRA account. The customer is provided with a basic Express IRA fee schedule in a "Welcome" document mailed

---

[7]In at least some offices, H&R Block began listing the Express IRA fees on the inside cover of the Disclosure and Custodial Agreement for the 2006 tax season.

[8]Most customers only receive an itemized receipt if they make a request. At about ten percent of H&R Block's offices, an itemized receipt is automatically printed regardless of whether the client makes a request. Customers who pay their fees in cash also receive a receipt. (HRB 93985).

to the customer weeks <u>after</u> he or she opens an account.[9]  And until 2005, that fee schedule fraudulently claimed that the Account Opening and Recontribution fees are $0.00. The real price was only disclosed in a confusing footnote at the bottom of the page that specifies:

> * An Account may be charged a $15 Account opening or $15 Recontribution Fee if none of the following apply.
>
> -Account owner qualifies and takes advantage of the saver's credit
> -Account has minimum balance of $2000
> -Minimum monthly systemic investment of $150 is established
> -Account owner purchases a Refund Anticipation Loan

(HRB 4174).   Most accounts in fact had to pay these fees.

60.     Moreover, H&R Block fails to inform clients that opening an Express IRA increases the complexity of a client's tax forms and results in the client paying additional fees to H&R Block. H&R Block internally refers to these fees as "tax complexity" fees, or, as one H&R Block employee describes, the "increase in tax preparation fees that are related to an Express IRA." As one H&R Block study regarding the Express IRA reports:  "The increase in complexity is driven primarily by additional IRA forms and worksheets, Saver's Credit form and forced migration from 1040EZ to 1040A or regular." (HRB 6357).  Another study reports that H&R Block expects to earn an average of more than $20 in tax complexity fees per Express IRA account (HRB 12293), resulting in an additional $3.3 million of fee revenue per year. (HRB 42389-90). With tax complexity fees, first-year Express IRA fees approach $50, or 16% of the median $300 initial investment.

61.     In addition, H&R Block charges more than $20 for the tax forms associated with early withdrawals from an Express IRA. Thus H&R Block itself has recognized that "Express IRA clients

---

[9]A customer has ten business days to rescind an Express IRA investment but the $15 opening fee is not refundable.  After the tenth business day, the customer must also pay a $25 account closing fee to rescind the investment. (HRB 2578).

are $15.71 or 10.9% higher in revenue on average than similar clients with no [Express IRA]."
(HRB 6357).

62.    While tax complexity fees are part of the cost of an Express IRA, H&R Block does
not adequately disclose them to its clients. The tax complexity fees are not itemized on the tax
professional's computer screen.  (HRB 93963).  For the vast majority of offices, H&R Block's
policies and procedures do not require the tax professionals to provide the customer with a bill
itemizing these fees. H&R Block does not instruct its tax professionals to discuss these fees with
customers or inform them that these fees are part of the Express IRA's cost.

### 2.    H&R Block fails to adequately disclose that an Express IRA investment will erode over time.

63.    H&R Block fails to adequately inform its customers that the value of their account
will decline over time unless they make large and continuing contributions to the Express IRA
because the fees discussed above swamp the Express IRA's low rate of return.  There is no disclosure
relating to the Express IRA's negative rate of return in its marketing materials.

64.    Instead, H&R Block misleads customers into believing their investment will increase
over time.  In 2005, H&R Block's tax preparation screens included a tool to be used by the tax
professional in discussions with customers called the "XIRA Calculator." (HRB93962).  The XIRA
Calculator projects the growth of a $300 Express IRA investment assuming a 2% interest rate.
Under the heading "Estimated balances for One-time Contribution," the XIRA Calculator predicted
for a 23-year-old customer: (1) after one year the investment would grow to $306; (2) after 10 years
the investment would grow to $366; and (3) by the time the taxpayer reached the age of 65, the
investment would grow to $681. The XIRA Calculator is extremely misleading because it does not

include any of the fees associated with the product. In fact, taking into account just the $10 annual maintenance fee: (1) after one year the investment would shrink to $296; (2) after 10 years the investment would shrink to about $256; (3) by the time the taxpayer reached the age of 65, the account would only be worth about $40.

65.     It is only after the client decides to invest in an Express IRA and is in the process of filling out an account application that he or she is given any disclosure relating to the potential negative rate of return. That disclosure appears on page 2 of the application and is reproduced below:

> FDIC - Insured Money Market Account Agreement: When you open an H&R Block Express IRA account with H&R Block Financial Advisors, your money will be automatically invested into an interest-bearing FDIC-insured money market account, with up to $100.000 of FDIC Insurance, through Reserve Management Corporation("Reserve"), at an insured - depository institution ("Bank").The insurance on your account will be limited to a combined total of $100,000 for all deposits held in the same legal ownership category per Bank, which includes this account and any other balances you have, directly or through other intermediaries. By opening an H&R Block Express IRA account, you agree to appoint Reserve as your authorized agent. If you have questions about FDIC coverage, you may call FDIC Consumer Affairs at 800-934-3342. Interest Rate: Each account will be paid a rate of interest, which may fluctuate daily depending on market conditions. Call 1-800-HRBLOCK for the current prevailing rate. Interest accrues from date of deposit to the last full day before withdrawal and is compounded daily and credited monthly. Deposits: The minimum initial IRA deposit is $300 with no minimum for subsequent deposits. If you start with a systematic monthly investment of $25 or more, you do not have to meet the $300 initial investment amount first. Withdrawals: You may make withdrawals at any time, in any amount. Withdrawals maybe subject to tax and/or a 10%penalty tax for early withdrawal. Statements: Statements will be mailed quarterly. Other tents: Each deposit is solely the obligation of the depositor's Bank. H&R Block Financial Advisors and Reserve act only as agents for you, the depositor. In the event Banks participating in the H&R Block Express IRA reject additional deposits or withdraw entirely or are terminated, then your agent is authorized by you to move your deposit to another FDIC-insured bank. H&R Block Financial Advisors may, without notice, refuse any deposit or close any account if an account owner's actions become burdensome. Reserve is paid a comprehensive fee, not to exceed 1.10% per annum, of the average daily net assets of the account. H&R Block Financial Advisors may receive compensation from Reserve for providing administrative, clerical, record keeping, bookkeeping and shareholder accounting

services. This amount is deducted daily prior to posting of interest to your H&R Block Financial Advisors account. In addition, your account will be charged an annual custodian fee of SIO unless a minimum $1,000 balance is met or account is enrolled in systematic investing-A one-time, small deposit may cause your principal to be reduced due to this custodial fee. Your deposit will be in book entry format: therefore, you will not receive a passbook or a certificate.

66.    Buried in this disclosure is the following sentence:  "A one-time, small deposit may cause your principal to be reduced due to [account fees and charges]." (HRB 1692). This disclosure is not only misleading – in fact virtually all small (i.e., $300), one-time Express IRA deposits will eventually lose money – but is completely inadequate because of its size and because it is not provided to the customer <u>before</u> he or she decides to open an Express IRA account.

67.    In any case, this disclosure is ineffective:  a high percentage of customers indeed make small, one-time contributions to an Express IRA investment and then see the principal of the investment decline.  According to H&R Block's own calculations, only 27% of Express IRA clients recontribute one year after opening an account, only 13% recontribute two years after opening an account, and only 8% recontribute three years after opening an account.  (HRB 6363).  H&R Block was aware of the low re-contribution rate as early as 2003, when the Express IRA product manager noted:  "[t]he re-contribution rate right now is at 21.9% - way below what we expected" (HRB 77943).  Yet H&R Block did nothing to improve its disclosure concerning one-time, small contributions.

### 3.    H&R Block fails to adequately disclose IRA penalties meant to discourage early withdrawals.

68.    Like all IRAs, the Express IRA has features meant to discourage early withdrawals. With a few limited exceptions, an early withdrawal from a traditional IRA results in the loss of IRA

tax benefits and the payment of an additional 10% withdrawal penalty. In addition, H&R Block currently charges a $25 fee for closing an Express IRA account (reduced from $75).

69.    H&R Block knows that many of its customers are pressed for cash to buy necessities and also knows that they cannot withdraw money from a traditional IRA for daily needs without paying taxes and penalties. In its advertising, H&R Block has downplayed the fact that the Express IRA is supposed to be a retirement vehicle with structural features meant to deter early withdrawals. It has done so because it knows that a long-term savings product is not attractive for many, of its customers who have short term savings needs. As the Express IRA product manager observed in a 2003 e-mail discussing whether to use the word "retirement" in an Express IRA commercial: "I agree that the [sic] using the term `retirement' is too long-term of a descriptor. Retirement as commonly defined by most people is not a likely reality for most of our [Express IRA] clients. Their savings needs are more short-term in nature." (HRB 68203).

70.    H&R Block's marketing materials implement this strategy by not featuring the word "retirement" prominently and by characterizing the Express IRA more generally as a "better way to save." H&R Block did not warn its customers that IRAs are only appropriate for long-term savings until after this investigation began. In addition, the materials minimize the significance of tax and penalties for early withdrawals by relegating the warning that "[e]arly withdrawals may be subject to tax and penalty," to a footnote in extremely small type. (HRB 5980).

71.    The result of this inadequate disclosure has been that hundreds of thousands of customers have invested in an Express IRA even though they cannot afford to keep the money in an IRA for retirement. Analysis of H&R Block's data shows that an average Express IRA account is closed within just three years. A May 2005 H&R Block study (that treats accounts with less than

$10 as open) shows that more than 35% of the Express IRA accounts opened in 2001 and 2002 have since been closed. Approximately 30% of the Express IRA accounts opened in 2003 have since been closed. Approximately 20% of the Express IRA accounts opened in 2004 have since been closed. (HRB 58693-58695).

72.    H&R Block has been well aware of the high rate of early withdrawals. In late 2003, the product manager of the Express IRA was informed that 43,000 Express IRA accounts (out of approximately 250,000 accounts open at the end of 2003) had balances under $1. (HRB 53697-8). A June 2004 chart showed that more than 66,000 Express IRA accounts(out of the approximately 250,000 accounts open at the end of 2003) had balances under $10. (HRB27278). Instead of addressing the fact that thousands of H&R Block customers were incurring withdrawal penalties, the product manager of the Express IRA simply closed the accounts.

73.    By de-emphasizing the tax penalties for early withdrawals and marketing the Express IRA as a general savings vehicle, H&R Block has induced hundreds of thousands of individuals to invest in a product inappropriate for their short-term savings needs. As a result, Express IRA customers have incurred an estimated $6 million in tax penalties for these early withdrawals.

**D.    H&R Block has allowed negligent misrepresentations about theExpress IRA by failing to ensure that its tax professionals understandthe Express IRA.**

74.    While H&R Block claims in its 2005 Express IRA "Welcome" brochure: "[w]e're here to provide you the most complete tax and financial advice" (HRB 4412), it knows it has failed to adequately train its tax professionals to give advice about the Express IRA. As the manager of the Express IRA wrote in a March 2004 e-mail, "[t]here is a very clear gap between our tax pro's needed level of understanding of [Express IRAs] and the . . . training materials." (HRB 51472). As

another manager noted in March 2004, "I hear over and over again `I don't know enough about IRAs to talk with my clients about them.'" (HRB 51582).

75.    IRAs are relatively complex products with both tax and financial implications. For example, holding assets in an IRA can affect an individual's ability to qualify for food stamps in, some states.  (HRB 10589, 13550).  But H&R Block tax professionals only receive a few hours of training on the Express IRA, which focuses only on the tax aspects of IRAs and does not prepare tax professionals to give financial advice.  Unlike financial advisors, tax professionals are not tested on their knowledge of the Express IRA before being permitted to offer it to customers.

76.    H&R Block knows that it provides low quality financial guidance to its Express IRA customers.  As one employee candidly admitted in April 2002: "We would never, ever, never in a million years, promote a service level for our `express' clients that had them meeting with advisors one on one.  The only `human' our express clients would ever interact with would be the tax pro or someone at a call center.  Now, if an express client wanted to be upsold, that's a different story...." (HRB 87512).  This employee jokingly compared the quality of service an Express IRA customer would receive to a Yugo while more affluent clients who sought securities brokerage services from H&R Block would receive service comparable to that of a Ferrari.  (HRB 87512).

77.    Guidance on the financial aspects of the Express IRA is essential because the product is an inappropriate financial choice for many of H&R Block's clients.  As H&R Block has been warned by its own tax professionals, many of H&R Block's clients cannot afford to invest in an Express IRA because they are under a great deal of financial pressure.  (HRB19375; HRB 58597). Many clients need cash for daily needs or to pay off high-interest rate credit card debt and are, not well served by a long-term savings vehicle.  Yet because they have not been adequately trained,

H&R Block tax professionals continue to sell Express IRAs to clients who cannot afford to keep funds locked up for substantial amounts of time.

78.    Despite the extremely high rate of early withdrawals and account closures by Express IRA customers, H&R Block took no remedial measures until after the Attorney General Spitzer's investigation began. Rather than train its tax professionals to give adequate advice, its response in 2004 was to try to encourage the dogma that the Express IRA is a good product for all H&R Block customers and "buy results," by offering $25 to tax professionals for each Express IRA sold (the maximum award was $100). (HRB 4672).

### FIRST CAUSE OF ACTION

### Violation of Michigan's Consumer Protection Act[10]

### (Mich. Comp. Laws Ann. § 445.901, *et seq.*)

79.    The acts and practices of the Defendants relating to the Express IRA violate the applicable sections of Michigan's Unfair and Deceptive Trade Practices Act, in that Defendants have engaged in repeated in deceptive acts and practices prohibited by Mich. Comp. Laws Ann. § 445.901, *et seq.*, specifically the provisions of § 445.903. As a result of Defendants' unfair and deceptive trade practices, Plaintiff and the putative class have been damaged.

---

[10]Defendants' 2004 Express IRA Disclosure Statement and Agreement for Individual Retirement Accounts provides in Article VIII, Section 3 that "[t]his Agreement shall be construed and administered in accordance with the laws of the State of Michigan and any relevant federal law, without regard to the community property laws of any state." Plaintiff hereby provides notice that he seeks to assert Michigan law on behalf of himself and on behalf of the putative class in this action.

WHEREFORE PREMISES CONSIDERED, Plaintiff seeks to recover actual damages for himself and on behalf of the class and for attorney's fees associated with the prosecution of this matter.

## SECOND CAUSE OF ACTION

### Misrepresentation and/or Suppression

80.     Plaintiff adopts, re-alleges and incorporates each and every allegation above, as though fully set forth herein.

81.     In or around February 2004 (the 2003 Tax Season), Plaintiff used H&R Block's tax preparation services and was sold an Express IRA.  The Express IRA was sold to Plaintiff as a Roth IRA and was funded by Plaintiff with $500.  At all times material hereto, Defendants were under a duty to not misrepresent the true nature of their Express IRA outlined in the Defendants' marketing materials and in the parties' contract.  Defendants intentionally, recklessly or negligently misrepresented that its Express IRA was a suitable retirement program and failed to disclose the hidden fees and low investment rates associated with the product.

82.     Defendants intentionally misled Plaintiff and putative class members as to the true nature and purpose of their Express IRA program.  At the time Defendants made these representations to Plaintiff, Defendants knew that these representations were false.

83.     Specifically, Defendants misrepresented to and/or suppressed from Plaintiff the following information:

a.     That Defendants' Express IRA was a great or adequate retirement investment;

b.     That Defendants' Express IRA was comparable to or better than other investment retirement accounts;

c.     By failing to disclose that Defendants would charge exorbitant fees in association with the creation, maintenance and cancellation of the Express IRA;

d.     By suppressing and/or misrepresenting the facts alleged herein which constitutes engaging in a pattern and practice of untruthful statements, false representations, concealment, and intent to mislead in its contractual agreements;

e.     By failing to disclose that Defendants knew that the fees charged by Defendants associated with the Express IRA outweighed any benefits associated with the product;

f.     By failing to disclose that a number of Express IRA customers' accounts lost money;

g.     By failing to provide Plaintiff and other putative class members with enough information to make an informed decision regarding the Express IRA product;

h.     By charging Plaintiff unconscionable fees and engaging in unconscionable practices.

i.     By misrepresenting and failing to disclose other facts as set out herein.

84.     By intentionally, recklessly or negligently misrepresenting the nature of its Express IRA product, as set out herein, Defendants have taken advantage of Plaintiff, who based upon such misrepresentations, was misled into entering into the contract and has suffered damages as a result.  Moreover, by intentionally, recklessly or negligently misrepresenting the Express IRA program as set out herein, Defendants have taken advantage of Plaintiff, who based upon such misrepresentations, was misled into entering into the Express IRA contract and has suffered damages as a result.

85.     Defendants suppressed the information set out herein, with the intent and ultimate

result that Plaintiff and other individuals would enroll in an Express IRA product that significantly increased Defendants' profits. At the time Defendants suppressed this information from Plaintiff, Defendants knew or should have known that they were under a duty to communicate the true nature of Express IRA program.

86.     By suppressing the nature of its Express IRA program and not disclosing material information concerning such program, Defendants have taken advantage of Plaintiff, who based upon such omissions set out herein, was misled into enrolling in the Express IRA program. Defendants further suppressed the fact that they would charge exorbitant account fees and that the retirement account would not perform as advertised. Such nondisclosure constitutes a suppression that Defendants knew or should have known and had a duty to communicate.

87.     Defendants' misrepresentations and suppressions of material facts have damaged Plaintiff and the putative class.

WHEREFORE PREMISES CONSIDERED, Plaintiff seeks to recover compensatory and punitive damages for himself and on behalf of the class.

## THIRD CAUSE OF ACTION

### Breach of Contract

88.     Plaintiff adopts, re-alleges and incorporates each and every allegation set forth above as though fully set forth herein.

89.     A written contract exists between Plaintiff and Defendants. Plaintiff has fully performed his obligations under the terms of the contracts. Defendants have failed to perform their obligations pursuant to the terms of the contract, as set out herein.

90.     Defendants' practices have caused Plaintiff and the putative class to lose money. Accordingly, Plaintiff and the putative class are entitled to compensatory damages, plus interest.

WHEREFORE PREMISES CONSIDERED, Plaintiff seeks to recover compensatory damages for himself and on behalf of the class.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment/Constructive Trust

91.     Plaintiff adopts, re-alleges and incorporates each and every allegation set forth above as though fully set forth herein.

92.     Defendants, by suppressing from Plaintiff the material facts set forth herein, by misrepresenting the material facts set forth herein and by engaging in the other unlawful and/or wrongful conduct set out herein, knowingly obtained or exerted unauthorized control over Plaintiff's property with the intent to deprive Plaintiff of his property and/or knowingly obtained control over said property by deception and with the intent to deprive Plaintiff of his property by:

a.     creating or confirming an impression in Plaintiff which was false and which Defendants did not believe to be true; and/or

b.     failing to correct a false impression which Defendants previously created or affirmed; and/or

c.     failing to correct a false impression which Defendants were under a duty to correct; and/or

d.     preventing Plaintiff from acquiring information pertinent to the disposition of their property and/or the actions and/or inactions set out herein.

e.     by misrepresenting material facts and failing to disclose material facts as set

33

out herein.

93.    Such illegal and fraudulent conduct engaged in by Defendants has resulted in
Defendants obtaining money, which in equity and good conscience, belongs to Plaintiff and the
putative class.

94.    Plaintiff further requests that the Court impose a Constructive Trust on such monies
and require Defendants to repay such monies to Plaintiff.

95.    As a direct result thereof, Defendants have been unjustly enriched, and Plaintiff
and the putative class have been injured and damaged and seek recovery of all monies improperly
procured or withheld.

WHEREFORE PREMISES CONSIDERED, Plaintiff seeks to recover and is entitled to
damages for himself and on behalf of the class.

## FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

96.    Plaintiff adopts, re-alleges and incorporates each and every allegation set forth above
as though fully set forth herein.

97.    In every contract and transaction of this kind, there are implied covenants of good
faith and fair dealing.  These implied covenants prevent one party from exercising judgment in such
a manner as to evade the spirit of the transaction or to deny the other party the expected benefits of
the contract.

98.    When Plaintiff entered into his Express IRA contract and into his business
transaction with Defendants, he reasonably believed that if Defendants prepared his tax return and
offered him an investment product, Defendants would not grossly overcharge Plaintiff for such

services and products.  Additionally, Plaintiff reasonably believed and had the right to believe, that

if Defendants obtained an investment product for him, that exorbitant fees would not be charged and

that the retirement investment product would not lose money or underperform.

99.     However, Defendants breached the implied covenants of good faith and fair

dealing by evading the spirit of the transaction by charging exorbitant and grossly unfair fees which

were far in excess of the market rate and by misrepresenting material facts and failing to fully

disclose all material terms associated with the Express IRA investment product.

100.    Moreover, by engaging in the misleading and deceptive practices described

herein, Defendants have successfully taken advantage of Plaintiff's and the putative class's lack of

knowledge and sophistication regarding the entire transaction described herein.

101.    As a direct and proximate result of Defendants' breach of the implied covenants

of good faith and fair dealing, Plaintiff and the putative class have been damaged in an amount to

be proven at the trial.

WHEREFORE PREMISES CONSIDERED, Plaintiff seeks to recover and is entitled to

compensatory and punitive damages for himself and on behalf of the class.

## SIXTH CAUSE OF ACTION

### Breach of Fiduciary Duty

102.    Plaintiff adopts, re-alleges and incorporates each and every allegation set forth above

as though fully set forth herein.

103.    Defendants enrolled Plaintiff in its Express IRA product.  Defendants,

acting as both Plaintiff's tax preparer and financial advisor, owed a fiduciary duty to Plaintiff and

to the putative class to obtain an adequate retirement investment account.    Under these

35

circumstances, the relationship between the parties transcended a normal business relationship. This fiduciary duty or confidential relationship arose because Plaintiff placed special trust and confidence in Defendants and because Defendants assumed this duty by representing itself to third parties as Plaintiff's fiduciary.

104.    Defendants had a duty to act in the best interests of the Plaintiff and the putative class members, or at least not to act in a manner which was directly adverse to the interests of the Plaintiff and the putative class.

105.    Defendants had an affirmative duty to disclose to the Plaintiff and the putative class the material information and exorbitant fees associated with the Express IRA as set out above. Defendants had an affirmative duty to disclose to Plaintiff and the putative class that the Defendants derive substantial income through the sale of Express IRA products and had a financial incentive to sell these products to its clients. The disclosure form and marketing materials failed to disclose any information to Plaintiff and the putative class that would allow them to make an informed decision regarding the Express IRA product.

WHEREFORE PREMISES CONSIDERED, Plaintiff seeks to recover and is entitled to compensatory and punitive damages for himself and on behalf of the class.

**SEVENTH CAUSE OF ACTION**

**Violation of Missouri's Merchandising Practices Act**

(Mo. Rev. Stat. § 407.010, *et seq.*)

106.    The acts and practices of the Defendants relating to the Express IRA violate the applicable sections of Missouri's Merchandising Practices Act, in that Defendants have engaged in repeated in deceptive acts and practices prohibited by Mo. Rev. Stat. § 407.010, *et seq.* As a result

of Defendants' unfair and deceptive trade practices, Plaintiff and the putative class have been damaged.

WHEREFORE PREMISES CONSIDERED, Plaintiff seeks to recover actual damages for himself and on behalf of the class and for attorney's fees associated with the prosecution of this matter.

## EIGHTH CAUSE OF ACTION

### Injunctive Relief

107.    Plaintiff adopts, re-alleges and incorporates herein each and every allegation above, as though fully set forth herein.

108.    Plaintiff respectfully requests that this Honorable Court permanently restrain and enjoin Defendants and any of its agents or others acting on its behalf from engaging in any fraudulent practices in violation of Michigan's Consumer Protection Act ( Mich. Comp. Laws Ann. § 445.901, *et seq.*) And Missouri's Merchandising Practices Act (Mo. Rev. Stat. § 407.010, *et seq.*).

### PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY

/s/ James M. Terrell
Robert G. Methvin, Jr. (MET009)
James M. Terrell (TER015)
Attorneys for Plaintiff

**OF COUNSEL:**
**McCALLUM, METHVIN & TERRELL, P.C.**
2201 Arlington Avenue South
Birmingham, Alabama 35205
(205) 939-0199

37

**<u>PLEASE SERVE DEFENDANT BY CERTIFIED MAIL</u>:**

H&R BLOCK, INC.
4400 Main Street
Kansas City, Missouri 64111

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the above and foregoing has been served on all parties of record by U. S. Mail, postage prepaid, properly addressed, on April 4, 2006.

H&R BLOCK TAX SERVICES, INC.
The Corporation Company
2000 Interstate Park Drive, Ste. 204
Montgomery, AL 36109

H&R FINANCIAL ADVISORS, INC.
The Corporation Company
2000 Interstate Park Drive, Ste. 204
Montgomery, AL 36109

/s/ James M. Terrell
OF COUNSEL